EDWARD F. DONOHUE (SBN 112730)
edonohue@hinshawlaw.com
CASSIDY E. CHIVERS (SBN 203043)
cchivers@hinshawlaw.com
HINSHAW & CULBERTSON LLP
One California Street, 18th Floor
San Francisco, CA 94111
Telephone:     415-362-6000
Facsimile:     415-834-9070

Attorney for Non-Party Witness JOY BERTRAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ROSS COLBY,<br><br>Defendants. | ) Case No. 17-CR-00168-LHK-1<br>)<br>) **NOTICE OF MOTION AND MOTION TO**<br>) **VACATE ORDER THAT NON-PARTY**<br>) **WITNESS PRODUCE DOCUMENTS AND**<br>) **APPEAR AT EVIDENTIARY HEARING**<br>) **ON MAY 24, 2018**<br>)<br>) Date:  May 24, 2018<br>) Time:  2:00 p.m.<br>) Dept.:  Hon. Lucy H. Koh<br>)<br>) |

**NOTICE AND RELIEF SOUGHT**

Please take Notice that on May 24, 2018 Non-Party Witness, Joy Bertrand (Bertrand) will appear at 10 A.M. before this court seeking an order vacating that order of May 2, 2018 (Docket No. 61) ordering Bertrand to produce documents containing attorney-client communications and appear to testify at 2 PM on May 24, 2018 to offer testimony against her former client herein, Defendant Ross Colby, with respect to testimony he provided in a hearing of May 2, 2018 contesting that he should be bound by a Proffer Agreement of May 17, 2016 executed while Bertrand served as Colby's counsel.

Non-Party Bertrand hereby moves the Court for an order vacating its May 2, 2018 Court's order on the following grounds. This Motion is based on this Notice, the following points and authorities, the Declaration of Joy Bertrand filed herewith, the transcript of the May 2, 2018 hearing as transcribed by the United States Court Reporters Lee-Anne Shortridge, prepared on May 7, 2018, and exhibits thereto, and such other evidence that may be introduced at the May 24, 2018 hearing.

This Motion is made on the following grounds:

i.  Bertrand's ethical duty of loyalty to her former client precludes her from testifying about confidential communications and client confidences between her and Colby.

ii. Bertrand is a non-party to these proceedings and, as such, she cannot be compelled to testify, absent compulsory process. Her undivided duty of loyalty to Colby bars her from voluntarily complying with the May 2, 2018 order.

iii. Alternative means exist to obtain the information sought by the May 2, 2018 that do not invade Bertrand's ethical duties.

iv. Additionally, Bertrand's testimony about client communications and confidences risks a violation of Colby's right against self-incrimination.

v.  At the least, the Court should consider an *in camera* review of Bertrand's testimony, to protect Colby's rights as a former client of Bertrand and a criminal defendant in this proceeding.

## POINTS AND AUTHORITIES

### I.   INTRODUCTION/STATEMENT OF FACTS

Bertrand represented Colby between December 2015 and April 2017 (Declaration of Joy Bertrand ("Bertrand Decl."), ¶ 2). Bertrand formally withdrew from the representation of Colby when he was indicted in this case. (*Id.*) Attorney Vicki Young (Young) appeared as Colby's provisionally appointed counsel at his arrangement and bond hearing on April 11, 2017. (Docket No. 4, [Minute Entry]). It appears Young was formally appointed as Colby's counsel on April 26, 2018. (Docket No. 6 [CJA 23 Financial Declaration in support of request for appointment of counsel, filed under seal] and Docket No. 7 [CJA Contribution Order]).

1   During Bertrand's engagement, she negotiated a so-called pre-indictment Proffer Agreement

2   with the United States Government.  The United States initially investigated Colby for criminal

3   conduct, for which he was never formally charged in the indictment.  (Bertrand Decl. at ¶ 3, 4)

4   Between the time of her initial engagement and late March of 2016, Bertrand persuaded government

5   officials that the initial contemplated charges were not legally or factually supported.  (*Id.*)

6   On March 22, 2016, the United States forwarded to Bertrand a proposed proffer letter

7   seeking cooperation in its investigation in connection with letter charges.  (*Id.* at ¶ 5)  A common

8   and critical element of both the draft and final Proffer Agreement is that it contained explicit and

9   standard "use and derivative use" immunity terms approved by the United States Supreme Court in

10  *Kastigar v. United States*, 406 U.S. 441 (1972). ( *Id.*)

11  After communicating with the Government over approximately three months, Bertrand

12  finalized the scheduling of a proffer meeting between Colby and the Government on May 17, 2016,

13  at which time the Proffer Agreement would be discussed and executed.  (*Id.* at ¶ 4, 6).  Before May

14  17, 2016, Bertrand had with Mr. Colby privileged attorney-client communications regarding the

15  Government's investigation.  (*Id.* at ¶ 7).  Given Bertrand's undivided loyalty to Colby, no more

16  than the fact that Bertrand and Colby met on May 17, 2016 for between an hour and a half and two

17  hours can be disclosed, without disclosing confidential communications. (*Id.* at 7, 8).

18  Colby could not communicate final consent to the Proffer Agreement, before the joint

19  meeting with the Government.  The letter was in draft form and completely executory at the outset of

20  the meeting.  (May 2, 2018 Transcript at 73:10-74:17; 123:5-132:7)    Thus, not until the United

21  States conducted its interview of Colby under Evidence Code Section 401 were the terms of the

22  agreement satisfied.  (*Id.*)  Three government officials – two FBI agents and Assistant United States

23  Attorney Susan Knight --  were present, in addition to Bertrand, when the Section 401 interview was

24  completed.   (*Id.*). Those three witnesses are no better or worse witnesses than Bertrand, as to

25  whether Assistant U.S. Attorney Susan Knight (Knight) provided the standard admonitions she has

26  described to the court as to how evidence given on that day could and could not be used in the

27  future.  Nor are they any better or worse witnesses as to whether Colby expressed assent to the

28  agreement after hearing those admonitions, which he does not even appear to dispute.  According to

3

1   the May 2, 2018 hearing transcript, substantially all of this information already is before the court

2   and will apparently be further corroborated by FBI Agent Hellman.

3        The agreement itself is the best evidence of consent and knowledge of its terms.   Any

4   communication between Bertrand and Colby about the Proffer Agreement clearly is not as probative

5   as Knight's testimony regarding her review of the agreement with Colby at the joint meeting.   The

6   two FBI agents can verify Knight's testimony that the terms on use of the proffered statements were

7   discussed and that verbal statements of understanding and assent were made at the most critical time

8   – when the agreement was executed.

9        Given the intrusion on the attorney-client privilege involved, good cause is lacking to force

10   Bertrand to testify as to any advice provided before the formal agreement was executed. Colby

11   admitted he has memory problems. Colby repeatedly stated that he did not necessarily understand

12   what was said to him.  Colby repeatedly testified that he had cognitive problems in the relevant

13   period, including confusion caused by his medications.

14        The issue to be resolved is what Colby understood. The Court already has extensive

15   testimony on that subject.  Bertrand's statements as to what she said in the approximately two-hour

16   meeting will not help the rule on Colby's claims of lack of understanding and impaired capacity.

17        Bertrand first learned Colby's testified, when the Court called her during the May 2, 2018

18   hearing.  (Bertrand Decl. at ¶ 9)  She thereafter reviewed the transcript.  *Id.* at ¶8).

19        There is no indication in the transcript that Mr. Colby was informed before he began

20   testifying that Bertrand might be called as an impeachment witness against Colby until he had

21   finished testifying.  Thus, as discussed below, this case presents a serious question as to whether the

22   court should have ever admitted the testimony offered by Colby at the hearing in which he purported

23   to waive the attorney-client privilege. If he testified, without understanding that Bertrand may be

24   called as a witness to either corroborate or contradict his testimony, his testimony should never have

25   been taken.

26        Thus, the Court must examine, before finally adopting its initial finding of waiver, if Colby

27   fully understood that his testimony could lead to a finding of implied waiver and thus result in his

28   own counsel testifying against him.  A waiver that is a byproduct of not knowing his own counsel

4

NOTICE OF MOTION AND MOTION TO VACATE ORDER THAT NON-PARTY WITNESS PRODUCE
DOCUMENTS AND APPEAR AT EVIDENTIARY HEARING - CASE NO. 17-CR-00168-LHK-1

301914692v1 2496

1    might be called to testify against him is not a voluntary waiver. Bertrand asks this Court to carefully

2    examine this issue of informed consent before directing her to testify against her client.

3          This Court allowed the proceeding to go forward and conducted much of the examination,

4    without confirming that Young fully advised Colby that the consequences of his waiving the

5    privilege could be that Bertrand might thereafter appear to rebut and destroy the credibility of his

6    testimony, possibly exposing him to additional charges of perjury and making false statements.

7    Rather, the opposite was the case. Both Young and the prosecutor stated that the waiver would be

8    "limited" (May 2, 2018 Transcript (Transcript), p.46:6-17). This recitation of a "limited" waiver was

9    made regarding a witness, who repeatedly cited memory and a diminished capacity problems,

10   particularly as to final legal points based on confusion related to his medications for Lyme's Disease

11   and traumatic brain injury, etc.  There is no evidence in the record that the conditions have

12   improved.  Colby even asserted that he does not understand the meaning of "notwithstanding".  In

13   that circumstance there is a reasonable doubt as to whether Colby could have understood the

14   meaning of the vague phrase, "limited waiver." It is not even clear if defense counsel and the

15   prosecutor shared the same definition.  Moreover, as discussed below, "limited waiver" is an abstract

16   concept that virtually never has the same meaning from case to case.

17         Yet, the first time that there is any foundation that Colby was provided fair notice that his

18   former counsel could be called to impeach him is found on page 153 of the Transcript.  At that time

19   the court found a waiver of the privilege and determined Bertrand should be called as a witness.

20         Moreover, the Court determined that Bertrand should appear, not to allow it to rule on the

21   efficacy of the Proffer Agreement, but to prevent Colby from making potential post-conviction

22   claims of ineffective assistance of counsel in the future. (Transcript pp. 151:21-152:3).  The Court

23   has before it no evidence that Young explained to Colby that his testimony could be impeached by

24   Bertrand if he took the stand.

25         For that and other reasons discussed below, Bertrand objects to this order.  Colby may have

26   inadvertently waived the attorney-client privilege.  However, this problem is not cured by calling

27   non-party, former counsel to testify.   The ultimate issue of consent rests in what Colby understood

28

301914692v1 2496

as a lay person, who had no prior involvement in the criminal justice system. Bertrand could only speculate as to what went on in Colby's internal process.

The Court's order risks an unreasonable intrusion into the attorney-client privilege and the confidential attorney-client relationship. Technically, the Court does not have jurisdiction to order Bertrand to appear at all. However, the key issue is weighing the utility of the testimony and whether it is absolutely necessary to establish consent. The Ninth Circuit's standards cannot be satisfied, given that Colby's consent to the 2016 Proffer can be established, without invading the privilege. Finally, Bertrand's testimony would be unhelpful to either party. She can only speculate about what Colby fully understood.

## II. ARGUMENT AND AUTHORITIES

### A. Ethical Standards Applicable To California Attorneys

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States* 449 U.S. 383, 389 (1981).

California law requires an attorney "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." Cal. Bus. & Prof. Code § 6068(e)(1). As the California Supreme Court of California has pronounced, "[p]rotecting the confidentiality of communications between attorney and client is fundamental to our legal system." *People ex. Rel. Dept. of Corporations v. SpeeDee Oil Change Sys., Inc.*, 980 P.2d 371, 378 (Cal. 1999). The duty to maintain client confidences "is broader than the lawyer-client privilege and protects virtually everything the lawyer knows about the client's matter regardless of the source of the information." *Elijah W. v. Superior Court*, 216 Cal.App.4th 140, 151 (Ct. App. 2013).

Although the duty of confidentiality yields to a lawful court order, courts must exercise great care in ordering attorneys to disclose client confidences. *See United States v. Bergeson*, 426 F.3d 1221, 1224-25 (9th Cir. 2005) ("issuing a subpoena to a lawyer to testify against a client is an unusual step that always raises serious concerns, even absent any privilege").

Requiring an attorney to testify against his former client (or to produce documents related to his previous representation) places the attorney in an untenable ethical quandary. In *Bergeson*, the Ninth Circuit affirmed the district court's order quashing a grand jury subpoena of an Assistant

Federal Public Defender.  In that case, the lawyer represented a client who had jumped bail.  The Ninth Circuit found the district court's ruling "eminently reasonable."  *See Id.* at 1222-23, 1227. Even though the subpoenaed testimony related only to non-privileged information, the Ninth Circuit affirmed the district court's order quashing the subpoena, based on ethical considerations and broader concerns about prosecutorial abuse of such subpoenas.  *Id.* at 1225-27 ("The government is not automatically entitled to subpoena a lawyer to testify against his client merely because the Constitution does not prohibit it and the material is not privileged.").

The Ninth Circuit emphasized the importance of open communications between attorney and client to our system of justice, and affirmed the district court's exercise of discretion to quash the subpoena based on ethical considerations.  *See Id.* at 1226 ("There were good reasons for the district court's exercise of discretion.  A client's confidence in his lawyer, and continuity of the attorney-client relationship, are critical to our system of justice.").  Finally, the foregoing principles apply with equal force to a former attorney, such as Ms. Bertrand.  *See, e.g., San Francisco v. Cobra Solutions, Inc.*, 135 P.3d 20, 25 (Cal. 2006) ("[T]he duty to preserve client confidences survives the termination of the attorney's representation.").

### B.      Federal Standards Governing Implied Waiver Doctrine in Criminal Cases

In federal criminal cases, federal and not state law governs disputes as to the application and waiver of the attorney-client privilege. *United States v. Roberson*, 859 F.2d 1376, 1378 (9th Cir. 1988).  Waiver may arise by implication when, for example, a client asserts ineffective assistance of counsel.  *Bittaker v. Woodford*, 331 F.3d 715, 719-20 (9th Cir. 2003); *In re Lott*, 424 F.3d 446 (6th Cir.2005). Even in the ineffective assistance of counsel context, courts must construe any waiver as narrowly as possible to address the specific issue in dispute, such as ineffective assistance or good faith reliance on counsel. *Id.* [1] However, as the court noted in *Bittaker,* even that waiver must be "voluntary" and a defendant is entitled to reverse course and prevent the further use of the communications, if it abandons the defense. *Id.* at 721-23. As noted in *Dyer v. United States*, 2014 U.S. Dist. LEXIS 143659, at p. *2 (S.D. W. Va. 10/9/14) the voluntary consent requirement was

---

[1] *Bittaker's* holding may be of limited validity on a completely immaterial point, i.e, whether interlocutory relief was appropriate. *United States v. Yagman*, 507 Fed. Appx. 685 (9th Cir. 2013).

1    essentially incorporated into Ruel 502(a) of the Rules of Evidence. The Rule explicitly requires a
2    foundation that such a waiver is "intentional" and that the use of the otherwise privileged
3    communications be fair under the circumstances.

4        Federal courts recognize that the voluntary waiver requirement incorporates the ethical
5    requirement imposed on attorneys, universally recognized in all states, that such a waiver be
6    procured from the client with "informed consent". *Butler v. United States*, 2016 U.S. Dist. LEXIS
7    48870 at pp. *4-5 (D. Md. 4/12/16); *Harris v. United States*, 2016 U.S. Dist. LEXIS 5757 at pp. *4-7
8    (W.D. Va.1/19/16); *Nixon v. Sampson*, 389 F. Supp. 107, 119-20 (D. D.C. 1975). Thus, the record
9    must show that counsel obtained permission to divulge confidences, based on the informed consent
10   as to the consequences of a voluntary waiver. *Id.* California applies the identical mandatory ethical
11   requirements, reinforced by Rule 502(a), that the client only stipulate to waive confidences based on
12   informed consent as to the reason the privilege should be waived. Cal. Cod Prof. Conduct § 3-100.[2]

13       Here, the record contained no evidence that Colby understood, before he began testifying,
14   that afterward his own counsel might be called by the Court to potentially impeach him. All present
15   were preoccupied as to whether Colby was properly "Mirandized" two years earlier. Thus, there is
16   no evidence that anyone had fairly informed Colby, at the hearing or at any time, as to any of the
17   consequences of his waiver, before he took the witness stand.

18       The record indicates the opposite. The term "limited waiver" was used before Colby, who
19   then repeatedly asserted he only had a limited understanding of portions of exhibits he reviewed.
20   (Transcript p. 46:6-17) If anything, on the face of the record, Colby was likely misled into thinking
21   he would have the first and last word on his recollection two years earlier as to advice provided by
22   Ms. Bertrand.

23       In short, the record lacks the foundation to call Bertrand as a witness.  Knight and others
24   have testified extensively as to the identical types of admonitions Colby claims Bertrand never
25   made. (Transcript, pp. 112 et seq.) Colby's response to these claims is all over the place. He asserted
26   he was confused on May 17, 2016, based on the innumerable drugs he was taking and his history of

27   _____

28   [2] The prevention of criminal act or harm to another exceptions found in Sub-section (B) of the Rule do not apply here.

NOTICE OF MOTION AND MOTION TO VACATE ORDER THAT NON-PARTY WITNESS PRODUCE
DOCUMENTS AND APPEAR AT EVIDENTIARY HEARING - CASE NO. 17-CR-00168-LHK-1

301914692v1 2496

traumatic brain injury. (Transcript pp. 102-08). He claimed no understanding – even during his testimony -- of terms such as "rebuttal", "case-in-chief", "notwithstanding." He characterized his current understanding of the agreement as "half in Greek". (Transcript pp. 93-96). Colby disclaimed knowing what he signed, because of the "legal nomenclature." Colby claimed he trusted his attorney that he should sign the agreement for that reason alone. (Transcript at 92, 98). While Colby seems to offer a general concession of reliance on counsel, he then disavowed reliance on anything Ms. Bertrand may have actually told Colby before signing. When asked if he knowingly signed the agreement after confirming he understood certain terms, Colby stated, "When your life is in danger you will sign anything." (Transcript at 97).

With this record, no possible purpose could be served in calling Bertrand. Neither Bertrand nor Knight is in a position to rebut Colby's subjective understanding as to the meaning of what was said regarding the May 17, 2016 proffer agreement. The Court has ample evidence to assess the credibility of Colby's claim that his understanding of the Proffer Agreement was inconsistent with its terms. He maintains he cannot understand the agreement to this day. (Transcript pp. 88-102). Evidence as to what Colby understood two years earlier has minimal probative on the issue of informed consent, in light of the overall record. Thus, Colby stated "I'm having trouble recalling details of what was said" (Transcript p. 85) and that he recalled none of Knight's statements at the meeting because "It's so fuzzy. It's so long ago". (Transcript at 86-87).

The purpose of the hearing was to determine whether the Proffer Agreement should be set aside, not to preserve evidence for some hypothetical ineffective assistance claim that may be made years in the future. Ms. Bertrand can add nothing meaningful to the record, in light of the lengths Colby has gone to dispute he understood or is even capable of understanding that which he signed to this day.

## C.     A Non-Party Cannot Be Compelled To Testify In a Criminal Case in the Absence of Compulsory Process

Given Bertrand's undivided duty of loyalty, she is legally obligated to raise procedural defects in the manner in which her testimony has been procured. Bertrand was served informally

NOTICE OF MOTION AND MOTION TO VACATE ORDER THAT NON-PARTY WITNESS PRODUCE DOCUMENTS AND APPEAR AT EVIDENTIARY HEARING - CASE NO. 17-CR-00168-LHK-1

301914692v1 2496

with the Order in question by email of May 3, 2018 from the Court's Courtroom Deputy.  (Bertrand Aff. ¶ _)

In light to the policies discussed in *Bergeson*, the Department of Justice requires high levels of oversight and scrutiny, before an attorney can be subpoenaed to testify against her client. *See, e.g.,* U.S. Attorneys' Manual, Chapter 9, § 9-13-410, Guidelines for Issuing Grand Jury on Trial Subpoena to Attorneys for Information Relating to the Representation of Clients. https://www.justice.gov/usam/usam-9-13000-obtaining-evidence. ("All reasonable attempts should be made to obtain information from alternative sources". United States Attorney Manual §§ 9-13.410(B)).

Under these Guidelines, the United States has not and will not subpoena Bertrand, even though the Government still appears to want to use the statements in the May 17, 2016 meeting in one way or another at trial.  Notably, Defense also has not served a formal subpoena on Bertrand. Yet the Court issued an order contrary to the express recommendations at the highest level of the Department of Justice and controlling Ninth Circuit precedent.

Based on Rule 1 of the Federal Rules of Criminal Procedure, the Criminal Rules are promulgated by the Supreme Court to govern *all* criminal proceedings pursuant to 28 U.S.C. § 2071. Rule 17 establishes that compulsory process must be executive to compel the attendance of a non-party attorney. *See, e.g., Bergeson*, 425 F.3d at 1223. The Court has no independent jurisdiction over a non-party in a criminal case, with limited exceptions.

First, jurisdiction can be extended to non-parties cases, in which there is "virtual representation" or some other form of close relationship and/or privity between a defendant and a non-party. *Irwin v. Mascott*, 370 F.3d 924, 929-31 (9th Cir. 2004). Here, no existing attorney-client or other relationship supports such jurisdiction. Rather, the Court seeks to examine Bertrand as an *adverse* witness. That precludes an extension of personal jurisdiction under *Irwin*, 370 F.3d at 930, *citing, Cunningham v. Gates*, 312 F.3d 1148, 1155-56 (9th Cir. 2003).

A second potential basis for personal jurisdiction can be established, if there is a closely related claim and dispute between a criminal defendant and a non-party. *See, e.g., United States v.*

301914692v1 2496

*Polishan*, 19 F.Supp.2d 327 (M.D. Pa. 1989). Here, there is no present relationship or dispute between Defendant and Bertrand and, thus, no basis for jurisdiction. *Polishan*, 19 F.Supp.2d at 333.

This jurisdictional issue is important because, unless it is cured, Ms. Bertrand's appearance and testimony could be collaterally attacked, undermining any final ruling based on the hearing.

To this issue, Bertrand would only add that her appearance herein is not voluntary. The Court unquestionably has subject matter jurisdiction over the parties to this case. As such, under the collateral bar rule, Bertrand must obey the order, appear, and raise the objections made herein. She has no privilege to ignore the order on the grounds set forth herein. *In re Novak*, 932 F.2d 1397, 1400-01 (11th Cir. 1991).

### D.   Where Alternate Means Exist to Prove Knowledge of a Criminal Defendant, an Attorney Shall Not be Lawfully Compelled to Provide Adverse Testimony

As the Court recognized in *Bergeson* there is no hard and fast rule as to when an attorney should be ordered to testify. The decision is made on a case-by-case basis. 425 F.3d at 1226. However, the court ruled that, even in grand jury proceedings where constitutional protections are more limited, the practice is disfavored. 425 F.3d at 1224-25. Here, the Court is relies on the fact that there was a waiver of the privilege, whether deliberate or inadvertent, at the May 2, 2018 hearing. However, *Bergeson* holds that the question of whether any privilege applies to the testimony is *not relevant*. *Id.* at 1221. The holding of *Bergeson* is directed at preserving the confidential relationship, not the privilege. *Id.*

Further, the bar for overcoming the prohibition on compelling such testimony is high. There must be a justification to order such testimony based on the weighing of several factors, including both a showing of reasonable necessity and that the information is available from no other source. *Id.* at 1225-26.

The only necessity here would apparently be to impeach Colby's testimony that he was never advised prior to executing the Proffer Agreement how it would operate in further proceedings. Thus, as in *Bergeson*, the state of Colby's *knowledge* is at issue. *Bergeson* dealt with a bail jumping offense in which the defendant denied knowledge of a trial date. *Id.* at 1223-24. However, as in this case, the court in *Bergeson* had available independent evidence about the defendant's knowledge. In

11

*Bergeson*, the evidence was a memorandum from the defendant's mother verifying a statement that the defendant himself had advised her of the trial date. *Id.* In this case, the Court has available the testimony of Mr. Colby, the AUSA, and two FBI agents.

The Court noted that testimony from counsel might be the simplest and clearest way to prove knowledge but that alone fell short of establishing necessity. *Id.* at 1226. As in *Bergeson*, however, the signed agreement itself coupled with Ms. Knight's testimony and that of the FBI agents satisfy the alternate means test. Moreover, as already noted, unlike *Bergeson*, Bertrand's testimony as to this issue is actually *less reliable* as compared to the best evidence - the signed agreement and the statements witnessed at the meeting. To re-cap:

1.   The pre-meeting consultation dealt with multiple issues including the Proffer Agreement and inter-related issues. At the Proffer Agreement meeting itself, Colby was beyond the realm of prospective advice and within the realm of final decision-making.   By definition, Knight's admonitions and requested assurances that the terms were understood and agreed upon was the sole topic of discussion at the time of execution. As we read the transcript, Colby does not dispute Knight's account. Although his testimony is confused, he only claims lack of adequate pre-meeting advice by Bertrand. He concedes that there was no further confidential consultation with Bertrand after Knight's admonitions and before his execution of the Proffer Agreement. (Transcript, 73:10-74:4)  That is not a basis to set aside the agreement unless he had no understanding of what he was signing at the meeting itself.  Colby claimed that he not only was confused in May 2016, but also that he does not understand the plain language even to this day. That testimony, alone, makes the events of 2016 moot.

2.   The hypothetical "best case scenario" on which the court might speculate is that Bertrand will admit error in providing Colby no advice regarding Proffer Agreement in the course of 90-minute to two-hour meeting that was held before meeting with the Government. As a matter of common sense, the Court

12

1   must know that said potential testimony is a matter of pure speculation.

2   Without said foundation, the Court should not force the issue, in light of the

3   explicit policy in this Circuit of not doing so.  Further, if, instead, Bertrand's

4   testimony contradicts Colby, the Court is left with disputed credibility

5   evidence on which it can provide no legitimate weight. That is not true of the

6   account of the prosecuting attorney. Neither the Defense nor the Court re-

7   called Colby to rebut the AUSA's account that she followed her standard

8   disclosure and consent protocol. Her testimony is consistent with standard

9   operating procedure and commemorated in the agreement itself.   The

10   testimony is inherently reliable because it is standard operating procedure for

11   AUSAs and commemorated in the agreement itself.

12   3.   What was said in a meeting, at which multiple issues were discussed, is not

13       the same as what was understood, the essence of informed consent upon

14       which Bertrand can only speculate. Knowledge can be much more definitely

15       proven by what was done – Colby signed the agreement after reading in the

16       presence of the prosecutor.

17   Finally, the Court's desire to "get it right" on the issue of consent is in much greater jeopardy

18   if the court errs in ordering this testimony. It will create an otherwise unavailable basis for a

19   collateral attack on the Court's final decision.

20   **E.     The Court Is Precluded From Compelling an Agent of a Defendant to Divulge Self-Incriminating Testimony**

21

22   Bertrand is not at liberty to disclose the confidential communications at her separate meeting

23   with Colby on May 17, 2016 unless the court declines to vacate the order. There would be special

24   difficulties in compelling this testimony. Notwithstanding that Colby provided a statement to the

25   United States on May 17, 2016, the Court has no basis to conclude, one way or another, whether

26   other matters bearing on guilt or innocence were discussed with counsel before that meeting. Thus, if

27   Bertrand testifies, the Court could inadvertently assist the Government in obtaining new evidence at

28   a hearing not necessarily falling within the protections of Rule 410 of the Rules of Evidence.

13

NOTICE OF MOTION AND MOTION TO VACATE ORDER THAT NON-PARTY WITNESS PRODUCE DOCUMENTS AND APPEAR AT EVIDENTIARY HEARING - CASE NO. 17-CR-00168-LHK-1

301914692v1 2496

1    Thus, though the attorney-client privilege is irrelevant to this motion, the privilege against

2    self-incrimination is not. As previously discussed, it would be artificial, if not impossible, for Ms.

3    Bertrand to parse only that advice related to the mechanics of the Proffer Agreement. The

4    hypothetical limited waiver safeguards of the ineffective assistance of counsel cases are obviously

5    more difficult to follow in reality. A lengthy, confidential meeting is not comprised of easily

6    dissected sound bites.

7    A critical problem is that Colby already opened the door to culpability communications, by

8    repeatedly claiming he understood he was completely immune from prosecution based on the

9    agreement. Bertrand cannot meaningfully respond to Colby's assertion, without revealing what may

10   have been discussed on the issue of the future risk of prosecution, placing both the attorney-client

11   privilege and self-incrimination in harm's way.

12   The Court cannot compel a non-defendant agent to testify or otherwise produce evidence that

13   may incriminate the defendant. Depending on the questions put to Ms. Bertrand, she can and must

14   assert the Self-Incrimination Privilege any time the questions put to her may require it. *United States*

15   *v. Judson*, 322 F.2d 460, 463-65 (1963); *See also, United States v. Kasmir*, 499 F.2d 444, 454 (5th

16   Cir. 1974); *Colton v. United States*, 306 F.2d 633, 639 (2d Cir. 1962) *cert. den.* 371 U.S. 951 (1963).

17   The *Bergeson* case dealt only with balancing the necessity of need versus prejudice, when the

18   risk of invasion into the attorney-client privilege was close to nil (whether the attorney told the client

19   of the trial date). The need versus prejudice equation is that much more lopsided if the court compels

20   testimony about legal advice. This type of questioning creates an undue risk that statements made

21   regarding prosecution, conviction, and sentencing risks could be revealed.

22   This is a Pandora's box the Court of Appeals emphatically recommends district courts only

23   open as a last resort.

24   **F.    The Court Should Consider Evaluating Ms. Bertrand's Testimony *In Camera* to
         Determine Whether it is Unnecessary, Cumulative, or Irrelevant**

25

26   If the Court still believes, it should examine Ms. Bertrand, it should do so *in camera* and

27   under seal. *E.g., In re Grand Jury Subpoena of Attorney (Under Seal)*, 679 F.Supp. 1403, 1413 (N.D.

28   W.Va. 1988); *In re Air Crash at Lexington*, 2009 U.S. Dist. LEXIS 104507 at p. 31 (E.D. Ky.

1  11/4/2009). Since no party has sought to subpoena this testimony, the Court could do so to determine

2  if the testimony is merely cumulative and of minimal evidentiary value, as compared to the evidence

3  already before it. If so, then the Court could exclude Bertrand's testimony on that basis.

4       The Court also can consider if, given Colby has limited his testimony to challenging his

5  understanding of the waiver, Bertrand's potential testimony is of inadequate probative value to

6  impact any conclusion the Court may reach, based on other evidence. A swearing match on what

7  was said in confidence between Bertrand and Colby will not help the Court determine what Colby

8  understood at any time.

9       By conducting the examination *in camera*, the Court can also consider whether there is an

10  undue risk of compelling evidence protected by the Fifth Amendment through the introduction of

11  such evidence in open court where the witness will be subject to cross-examination by the actual

12  parties to the case.

13  **III.     CONCLUSION**

14       For the reasons described the Court's Order of May 2, 2018 compelling the testimony of non-

15  party witness should be vacated. Alternatively, the Court should take all procedural steps necessary

16  to avoid undue prejudice to Colby in enforcing said order.

17  DATED: May 21, 2018                    HINSHAW & CULBERTSON LLP

19      By:  */s/ Edward F. Donohue*
20          EDWARD F. DONOHUE
        CASSIDY E. CHIVERS
21          Attorney for Non-Party Witness JOY
        BERTRAND

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO VACATE ORDER THAT NON-PARTY WITNESS PRODUCE
DOCUMENTS AND APPEAR AT EVIDENTIARY HEARING - CASE NO. 17-CR-00168-LHK-1
301914692v1 2496