UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>ROSS COLBY,<br><br>    Defendant. | Case No. 17-CR-00168 LHK<br><br>**ORDER GRANTING PLAINTIFF'S MOTION IN LIMINE #3A** |

Before the Court is Plaintiff United States of America's motion in limine #3A, in which Plaintiff states its intention to introduce Defendant Ross Colby's May 17, 2016 proffer statements for impeachment and rebuttal purposes, as appropriate, during trial. ECF No. 38. After extensive briefing and two evidentiary hearings, the Court granted the motion orally on May 29, 2018, and stated that it would subsequently issue this written ruling.

I.     PROCEDURAL HISTORY

Plaintiff United States of America filed an indictment against Defendant Ross Colby. The indictment charges Defendant with: (1) intentional damage to a protected computer resulting in at least $5,000 loss by changing Embarcadero Media's mail exchange records at GoDaddy.com in

Case No. 17-CR-00168 LHK
ORDER GRANTING PLAINTIFF'S MOTION IN LIMINE #3A

1

order to redirect Embarcadero Media's corporate email on September 17, 2015, in violation of 18 U.S.C. §§ 1030(a)(5)(A) & (c)(4)(B)(i); (2) attempting to damage a protected computer by accessing Embarcadero Media's account at GoDaddy.com and cancelling four of Embarcadero Media's domain names on September 17, 2015, in violation of 18 U.S.C. §§ 1030(a)(5)(A) & (c)(4)(B)(ii); and (3) three counts of intentionally accessing protected computers without authorization and obtaining information on July 23, 24, and 25, 2015, in violation of 18 U.S.C. § 1030(a)(2)(C).

On April 11, 2018, Plaintiff filed motion in limine #3 – Admissibility of Statements of the Defendant. ECF No. 38 at 9. Part A of this motion consisted of two sentences, which stated that Plaintiff intended to introduce Defendant's statements and admissions to the Federal Bureau of Investigation ("FBI") and others. *Id.*

On April 18, 2018, Defendant filed a response opposing the use of any statements he made during a May 17, 2016 proffer session. ECF. No. 43 at 2-5. The May 17, 2016 proffer session was held pursuant to a proffer agreement dated that same day and signed by Defendant; Defendant's then attorney, Joy Bertrand; and Assistant United States Attorney ("AUSA") Susan Knight. ECF. No. 79-1. In his, April 18, 2018 response, Defendant stated that he would testify at an evidentiary hearing to the following: "the meeting with the prosecutors was set up by his attorney Joy Bertrand. He had the understanding that the meeting would be covered by some sort of immunity." ECF No. 43 at 4. He "met with Joy Bertrand shortly before the meeting with the U.S. Attorney Office." *Id.* He "does not recall being advised that the prosecutors could use his statement to rebut any evidence offered or any factual assertions made by his attorney if he should go to trial. He will testify that he was never told that any effort on behalf of his trial attorney to raise a reasonable doubt at trial or to hold the government from their burden of proof would open the door for admission of the statement." *Id.*

Because the Court had insufficient information to rule on this motion, the Court on April

Case No. 17-CR-00168 LHK
ORDER GRANTING PLAINTIFF'S MOTION IN LIMINE #3A
2

20, 2018 ordered Plaintiff to file a reply by April 27, 2018. ECF No. 44. On April 27, 2018, Plaintiff filed a reply in which Plaintiff stated that at an evidentiary hearing, FBI Special Agents Anthony Frazier and Scott Hellman would testify that at the outset of the May 17, 2016 proffer session, AUSA Knight explained the proffer agreement to Defendant and his counsel and offered them additional opportunity to review and discuss the agreement before they signed it. ECF No. 50 at 3.

On April 30, the Court scheduled an evidentiary hearing on the instant motion for May 2, 2018, which was the date of the parties' pre-trial conference in this case. The May 2, 2018 pre-trial conference had been scheduled by the parties and the Court on December 6, 2017.

On May 1, 2018, Plaintiff informed the Court that FBI Special Agents Frazier and Hellman were not available on May 2, 2018. ECF No. 56 at 1-2. Thus, Plaintiff submitted declarations from AUSA Knight and both FBI Special Agents regarding statements made to Defendant regarding the May 17, 2016 proffer agreement. ECF No. 56.

On May 2, 2018, the Court held an evidentiary hearing in which Defendant and AUSA Knight testified. ECF No. 66. On May 4, 2018, FBI Special Agent Frazier submitted a second declaration. ECF No. 65. On May 24, 2018, FBI Special Agent Hellman testified regarding circumstances surrounding the May 17, 2016 proffer agreement. ECF No. 95.

II. LEGAL STANDARD

The U.S. Supreme Court has made clear that "[a] criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." *United States v. Mezzanatto*, 513 U.S. 196, 201, 204 (1995) ("The admission of plea statements for impeachment purposes *enhances* the truth-seeking function of trials and will result in more accurate verdicts.") (emphasis in original); *United States v. Rebbe*, 314 F.3d 402, 407 (9th Cir. 2002) (admission of defendant's proffer statements in rebuttal will assist in promoting the truth-seeking function of trials and was not error). *Mezzanatto* held that "absent some affirmative

Case No. 17-CR-00168 LHK
ORDER GRANTING PLAINTIFF'S MOTION IN LIMINE #3A
3

indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." 513 U.S. at 210. The question before the Court in the instant motion is whether Defendant's waiver of rights pursuant to the May 17, 2016 proffer agreement was knowing and voluntary.

### III. DISCUSSION

After considering the declarations, exhibits, and extensive testimony from Defendant and AUSA Knight on May 2, 2018, ECF No. 66, and from FBI Special Agent Hellman on May 24, 2018, ECF No. 95, and carefully observing each witness as he or she testified, the Court grants Plaintiff's motion in limine #3A for the reasons stated below.

#### A. The Proffer Agreement

The Court finds that the proffer agreement itself and the signatures of Defendant and his then counsel, Joy Bertrand, thereto support the Plaintiff's motion.

Defendant's proffer agreement sets forth the following limitations on Plaintiff's use of Defendant's May 17, 2016 proffer statements:

> (2) Except as set forth in paragraphs (3), the Office will not offer in evidence any statements made by Client at the meeting (a) in its case-in-chief at a trial against Client, or (b) at Client's sentencing. The Office may use any statements made by Client or any information directly or indirectly derived from statements made by Client at the meeting for any other purpose, including (a) to obtain leads to other evidence that may be used against Client at any stage of a criminal prosecution; or (b) in any prosecution of Client for perjury, false statements, or obstruction of justice.
>
> (3) Notwithstanding paragraph (2), the Office may use any statements made by Client at the meeting for any purpose (a) if Client testifies at any hearing or trial; or (b) to rebut any evidence offered, or factual assertions made, by or on behalf of Client at any stage of a criminal prosecution (including by not limited to a detention hearing, trial, or sentencing).

ECF No. 79-1 at 1.

Defendant signed and dated the proffer agreement below the following paragraph:

> I, Ross Colby, have read this agreement and carefully reviewed it with my attorney. I understand it, and I voluntarily, knowingly and willfully agree to it without force, threat or

Case No. 17-CR-00168 LHK
ORDER GRANTING PLAINTIFF'S MOTION IN LIMINE #3A
4

coercion. No other promises or inducements have been made to me other than those contained in this letter. I am satisfied with the representation of my attorney in this matter.

ECF No. 79-1 at 2. Thus, Defendant signed the proffer agreement and represented that he read the agreement, reviewed it with his attorney, understood it, and voluntarily, knowingly, and willfully agreed to it without force, threat or coercion. *Id.*, Tr. 96:23-97:11.

Defendant's then counsel, Joy Bertrand, signed and dated the proffer agreement below the following paragraph:

> I am Ross Colby's attorney. I have carefully reviewed every part of this agreement with him. To my knowledge, my client's decision to enter into this agreement is informed and voluntary.

ECF No. 79-2. Thus, Ms. Bertrand signed the proffer agreement and represented that she reviewed every part of the agreement with Defendant and believed that Defendant's decision to enter into the agreement was informed and voluntary. ECF No. 79-2.

B. Defendant's Testimony

Defendant's testimony at the May 2, 2018 evidentiary hearing was inconsistent. Initially, Defendant testified that his then counsel, Joy Bertrand, never told him what would be discussed at the proffer meeting and that Defendant "did not understand what would be discussed at the meeting." ECF No. 66, Tr. 98:6-10. However, on cross-examination, Defendant eventually admitted that he knew that the proffer session would have something to do with Embarcadero. *Id.*, Tr. 99:2.

Defendant initially insisted that Ms. Bertrand did not go over anything regarding the prosecutor's use of any statements Defendant made at the proffer session. *Id.*, Tr. 72:21-24. According to Defendant, Ms. Bertrand never discussed Defendant's right under the Fifth Amendment not to testify. *Id.*, Tr. 73:7-9. When asked, "Mr. Colby, going back to the meeting that was set up on May 17th, 2016, try to remember as best you can everything that Joy Bertrand told you about what could be done, if anything, with what was said at the meeting." *Id.*, Tr. 72:14-17. Defendant testified: "When Joy and I had lunch before going in, she told me, "Just go in there,

tell them what's going on, and this will end." *Id*., Tr. 72:18-20.

On the other hand, Defendant also testified that Ms. Bertrand mentioned immunity during the lunch prior to the proffer session. *Id.*, Tr. 75:18-21. Defendant testified that he recalled the word "immunity" and nothing else from his lunch with Ms. Bertrand other than that Ms. Bertrand advised Defendant to tell the FBI everything that was happening. *Id.*, Tr. 76:6-17. Defendant testified that Ms. Bertrand "was almost reluctant to talk about" the proffer agreement. *Id*., Tr. 50:13-14.

However, on cross-examination, Defendant admitted that Ms. Bertrand explained the proffer agreement to him. *Id.*, Tr. 90:22-25. Defendant also conceded on cross-examination that despite his insistence that he believed the proffer agreement gave him immunity, the word "immunity" never appears in the proffer agreement. *Id.*, Tr. 92:2-4.

Moreover, AUSA Knight's May 9, 2016 email to Ms. Bertrand that scheduled the May 17, 2016 proffer session and provided the proffer agreement states that the "purpose of the proffer session is to ascertain if anyone instructed Mr. Colby to illegally access Embarcadero media's computer network, including individual email accounts." ECF No. 60, Ex. 2. In the email, AUSA Knight states: "Also, we should discuss a pre-indictment resolution of the case. I will do a rough calculation of Mr. Colby's guidelines and get back to you." *Id*. Presumably, the "guidelines" calculated for a pre-indictment resolution refers to the sentencing guidelines. Thus, Plaintiff viewed Defendant as a target of Plaintiff's criminal investigation and not as an immunized witness. This undermines Defendant's claim that the proffer agreement granted him full immunity.

Defendant's testimony about not understanding the proffer agreement also lacked credibility. Defendant testified that he read the proffer agreement at the proffer session before he signed it. *Id.*, Tr. 74:13-75:5. Despite reading the proffer agreement, Defendant testified that he did not understand the terms of the agreement and thought that it was immunity. *Id.*, Tr. 74:11-20,

Case No. 17-CR-00168 LHK
ORDER GRANTING PLAINTIFF'S MOTION IN LIMINE #3A

Tr. 75:6-8. Defendant insisted that he just could not understand "legal nomenclature." *Id.*, Tr. 98:16. Defendant claimed that he did not and does not understand what the word "notwithstanding" in his proffer agreement means. *Id.*, Tr. 94:17-95:3.

Defendant's self-reported lack of understanding of his proffer agreement is undermined by Defendant's history of education and employment. Defendant graduated with a computer science degree and was a software engineer at EMC, a major technology company, from 2003 to 2006 or 2007. *Id.*, Tr. 67:2-5. Defendant served as the Chief Security Officer at Earnest Bank from September 2016, which is four months after the May 17, 2016 proffer session, through September 2017, where his job was to review contracts between Earnest Bank and Goldman Sachs, Verizon, Nationwide, AARP, Intuit, and a London-based financial institution called Willis Towers Waters to identify the companies' requirements for the handling of their customer data and then to identify what measures and security Earnest Bank had in place, what was not up to the companies' requirements, and how long it would take Earnest Bank to get into compliance with the companies' requirements. *Id.*, Tr. 67:14-68:25. As Earnest Bank's Chief Security Officer, defendant reviewed the contracts identified above, doubled as the bank's IT Administrator, and was in charge of the bank's compliance and control operations, including Sarbanes-Oxley compliance. *Id.*, Tr. 68:19-69:15, 70:23-24. Defendant assigned tasks to the home loans team, the infrastructure team, the IT operations team, and the customer call center team, so that Earnest Bank could come into compliance with its obligations. *Id.*, Tr. 70:5-71:4. Defendant's high level responsibilities, which specifically included reviewing contracts between Earnest Bank and sophisticated parties such as Goldman Sachs and Verizon, undercuts Defendant's attempt to feign ignorance or lack of understanding of the terms of the proffer agreement. It is simply not credible that Defendant does not understand what the word "Notwithstanding" means.

The Court also rejects Defendant's implication that his medications at the time of the May 17, 2016 proffer session caused him to lose focus or be confused. In 2006, Defendant suffered a

traumatic brain injury when he was involved in an automobile accident. *Id.*, Tr. 65:18-25. Defendant was taking medication on May 17, 2016 for lyme disease and has chronic post-concussive syndrome that has rendered him eligible for SSDI payments from February 2008 to the present. *Id.*, Tr. 102:18-103:18. Defendant took these same medications during his high level and sophisticated work as Chief Security Officer for Earnest Bank from September 2016 through September 2017. *Id.*, Tr. 106:11-13.

Moreover, although Defendant claimed that he was not able to "think straight" during the time period when he was preparing to participate in the May 17, 2016 proffer session, *id.*, Tr. 77:9-12, Defendant recalled doing a year and a half long lighting project for the 2017 Burning Man that required "a lot of planning." *Id.*, Tr. 78:17-21. Defendant testified, "I spent a lot of my time sourcing materials from China." *Id.* For the previous Burning Man, Defendant spent a few weeks sourcing materials from China, and performing "basic" responsibilities such as installing solar, a car battery, and some lights. *Id.*, Tr. 79:4-21. Defendant also installed lighting and LED artwork for a restaurant, which included construction work, prepping the work, sourcing and testing the materials, and being responsible for quality control, for about a month a half. *Id.*, Tr. 79:25-80:22. Defendant's occasional confusion and loss of focus due to medications and chronic post-concussive syndrome did not appear to affect his ability to perform high level and sophisticated work, his memory, or his understanding and execution of complex planning or ideas.

Ultimately, on cross-examination, Defendant testified that at the time he signed the proffer agreement at the May 17, 2016 proffer session, Defendant understood at least the paragraph stating that he read the agreement, reviewed it with his attorney, understood it, and voluntarily, knowingly, and willfully agreed to it without force, threat or coercion. *Id.*, Tr. 96:23-97:11. In addition, Ms. Bertrand signed the paragraph stating that she reviewed every part of the agreement with Defendant and believed that Defendant's decision to enter into the agreement was informed and voluntary. ECF No. 79-2.

Moreover, Defendant's testimony that he identified a discrepancy regarding his proffer agreement the day after the proffer session further undermines his claim that he did not understand his proffer agreement. When asked whether AUSA Knight told Defendant anything in regards to the proffer agreement at the meeting, Defendant answered: "I can't recall anything specific other than they just laid it out in front of me and asked me if my attorney had gone over this and explained to me what this was and I said yes." *Id.*, Tr. 73:22-74:1. Defendant did not recall whether Ms. Bertrand or AUSA Knight said anything else to him prior to his signing the proffer agreement, nor did Defendant recall what they might have said to him. *Id.*, Tr. 85:21-86:20. Nonetheless, Defendant had a distinct recollection that Ms. Bertrand mentioned the word, "non-derivative" at the meeting. *Id.*, Tr. 86:21-25.

Defendant testified that he re-reviewed the proffer agreement the following day on May 18, 2016. He remembered AUSA Knight and Bertrand talking during the May 17, 2016 proffer session and that Bertrand said "something about non-derivative." *Id.*, Tr. 82:20-83:2. However, when Defendant re-read the agreement the day after the meeting, Defendant noticed a discrepancy in that the agreement stated "derivative," which was different from what Bertrand stated orally during the proffer session. *Id.*, Tr. 82:11-17. Aside from that one discrepancy, Defendant testified that everything else in the agreement was consistent with what was stated at the proffer session. *Id.*, Tr. 83:22-24. Defendant never raised the discrepancy with anyone. *Id.*, Tr. 83:7-13. Defendant's testimony that he identified a discrepancy regarding his proffer agreement undermines his testimony that he did not understand his proffer agreement.

On May 2, 2018, Defendant testified for one hour and 26 minutes. ECF No. 60 at 3. Overall, the Court finds that Defendant's testimony was not credible. Defendant's selective memory appeared self-serving. Defendant was evasive and dodged questions. His hesitation before answering questions appeared calculating. At times Defendant would not answer questions and instead would volunteer irrelevant facts and comments.

Case No. 17-CR-00168 LHK
ORDER GRANTING PLAINTIFF'S MOTION IN LIMINE #3A

9

By contrast, the Court finds that AUSA Knight's testimony was credible. She never evaded or dodged a question. Her testimony did not change. She never hesitated before answering. She was forthright in her answers and conceded where she lacked recollection even if recollection would have been helpful to her motion.

AUSA Knight testified that at the beginning of the May 17, 2016 proffer session, she emphasized to Defendant that the proffer agreement stated that whatever Defendant disclosed at the proffer session would not be used to charge him but could be used if Defendant testified at trial and lied. ECF No. 66, Tr. 123:17-124:4. AUSA Knight asked if Defendant needed time to review the proffer agreement with his attorney and that AUSA Knight and the FBI Special Agents would leave the room to allow Defendant to review the proffer agreement with his attorney. *Id*., Tr. 125:19-23. Defendant declined the opportunity to discuss the agreement privately with his attorney and signed the agreement. *Id*., Tr. 126:10-17.

FBI Special Agent Frazier's declaration supports AUSA Knight's testimony. Special Agent Frazier declared that at the May 17, 2016 proffer session, Defendant was provided time to read through the proffer agreement. Frazier Decl. ¶ 4. After receiving the proffer agreement, Bertrand and Defendant signed the agreement and returned it. *Id.*

The Court notes that in FBI Special Agent Hellman's notes, the phrase, "limited immunity" does appear. ECF No. 95, Ex. 4. FBI Special Agent Hellman's role during the proffer session was to take notes and participate in the interview. *Id.*, Tr. 9:24-25. The notes state: "Review proffer agreement. Lawyer and [Defendant] have discussed proffer. Limited immunity." *Id.*, Ex. 4. Although FBI Special Agent Hellman does not specifically remember writing those words down, he testified that he thinks he meant that the only way that Defendant could get in trouble "during the confines of that proffer was if he lied and, thus, that his statements could not be used against him directly; but that if he lied, they could be used at some other point in time, thus, your statement for making sure that it was important that he told the truth." *Id.*, Tr. 14:8-17;

26:19-27:1. This testimony is consistent with the terms of the proffer agreement.

For the foregoing reasons, the Court finds Defendant's waiver was knowing and voluntary and not the subject of fraud, force, threat, or coercion. Defendant made a voluntary and knowing waiver as there is no credible evidence of some affirmative indication that he entered into the proffer agreement unknowingly or involuntarily. *See Mezzanatto*, 513 U.S. at 210; *cf. Moran v. Burbine*, 475 U.S. 412, 421 (1986) (in the context of waiver of *Miranda* rights, stating that a waiver is made knowingly if the defendant has "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," and it is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception.").

Plaintiff's motion in limine #3A is GRANTED.

**IT IS SO ORDERED.**

DATED: June 5, 2018

*Lucy H. Koh*
LUCY H. KOH
UNITED STATES DISTRICT JUDGE

Case No. 17-CR-00168 LHK
ORDER GRANTING PLAINTIFF'S MOTION IN LIMINE #3A
11